UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

DOUBLE DIAMOND DELAWARE, §
INC., §
§
*Plaintiff*, §
§
v. §      Civil Action No. 3:17-CV-01403-X
§
HOMELAND INSURANCE §
COMPANY OF NEW YORK, §
§
*Defendant.* §

## MEMORANDUM OPINION AND ORDER

This case arises from a 2015 tornadic weather event which damaged Double Diamond Delaware, Inc. (Double Diamond)'s golf-course community, The Retreat. The Court ruled on the parties' motions for partial summary judgment in an earlier order. [Doc. No. 105]. The only issue remaining in this case is "the amount recoverable by [Double Diamond] under the debris removal provisions of the policies."[1] Homeland Insurance Company of New York (Homeland) subsequently filed three motions to strike [Doc. Nos. 111, 114, 117], and Double Diamond also filed three motions to strike. [Doc Nos. 120, 122, 124]. After careful consideration, and as discussed below, the Court **DENIES** Homeland's motion to strike Jon Hillis, **DENIES** Homeland's motion to strike Jason Grogan, and **GRANTS** Homeland's motion to strike Scott Cullen. The Court **GRANTS IN PART** and **DENIES IN**

---

[1] Doc. No. 112 at 6.

1

**PART** Double Diamond's motion to strike Edward Steigerwaldt, **GRANTS IN PART** and **DENIES IN PART** Double Diamond's motion to strike Thomas Hittle, and **GRANTS** Double Diamond's motion to strike Bret Vicary.

## I. Background

Double Diamond's property was insured under three tiers of coverage. Steadfast Insurance Company (Steadfast) issued the first tier, which was capped at $2.5 million. Colony Insurance Company (Colony) issued the second tier, also capped at $2.5 million. Homeland issued the third tier, which covers damages beyond the $5 million covered by Steadfast and Colony.

In the Court's summary-judgment order, it found that: (1) the two underlying insurance policies were exhausted; (2) the value of Double Diamond's property is not a ceiling on its recovery; (3) the sublimits in the Steadfast policy are incorporated by the Homeland Insurance policy; (4) Double Diamond was required to actually replace damaged property before coverage was available on a replacement-cost basis; (5) because Double Diamond failed to replace damaged property within three years, it can only collect the property's actual cash value; (6) Double Diamond was not required to incur debris-removal expenses before recovering from Homeland; and (7) the actual cash value equals the cost to replace less the depreciation of the damaged property.

The remaining dispute concerns the amount Double Diamond can recover for debris removal. Recovery for debris removal is limited to "[t]he GREATER of 25% of

the PD [property damage] LOSS or $1,000,000."[2]  So, the recovery for debris removal requires determining the property-damage loss.  And to determine the property-damage loss, the actual cash value of Double Diamond's damaged trees must be determined.[3]

Homeland and Double Diamond each filed three motions to strike.  The Court will consider each motion separately.

## II. Legal Standard

Federal Rule of Evidence 702 governs the admissibility of expert testimony as evidence.  Rule 702 permits opinion testimony from a witness "qualified as an expert by knowledge, skill, experience, training, or education" if the expert's knowledge will assist the trier of fact, and (1) "the testimony is based on sufficient facts or data;" (2) "the testimony is the product of reliable principles and methods;" and (3) "the expert has reliably applied the principles and methods to the facts of the case."[4]   As a gatekeeper, this Court must permit only reliable and relevant testimony from qualified witnesses to be admitted as expert testimony.[5]  The party offering the expert testimony has the burden of proof, by a preponderance of evidence, to show that the testimony is reliable and relevant.[6]

---

[2] Doc. No. 113 at 59.

[3] Although other areas of The Retreat suffered damage, those areas make up a minority of the claim and are not in dispute.  *See* Doc. No. 135 at 5.

[4] FED. R. EVID. 702.

[5] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993); *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999).

[6] *Mathis v. Exxon Corp.*, 302 F.3d 448, 459–60 (5th Cir. 2002).

Expert testimony is relevant if it assists the trier of fact in understanding the evidence or determining a fact in issue.[7]  Federal Rule of Evidence 401 further clarifies that relevant evidence is evidence that has "any tendency to make a fact more or less probable than it would be without evidence" and "is of consequence in determining the action."[8]

Expert testimony is reliable if "the reasoning or methodology underlying the testimony is scientifically valid."[9]  Such testimony must be "more than subjective belief or unsupported speculation."[10]  In other words, this Court need not admit testimony "that is connected to existing data only by the *ipse dixit* of the expert."[11] The Court also does not need to admit testimony based on indisputably wrong facts.[12] In conducting its analysis, the Court focuses on the reasonableness of the expert's approach regarding the matter to which his testimony is relevant and not on the conclusions generated by the expert's methodology.[13]  The Court normally analyzes questions of reliability using the five nonexclusive factors known as the *Daubert* factors.[14]

---

[7] *Daubert*, 509 U.S. at 591.

[8] *See Mathis*, 302 F.3d at 460 (applying Rule 401 to expert testimony).

[9] *Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 352 (5th Cir. 2007) (citing *Daubert*, 509 U.S. at 592–93).

[10] *Daubert*, 509 U.S. at 590.

[11] *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

[12] *Guillory v. Domtar Indus., Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996).

[13] *Daubert*, 509 U.S. at 595; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153–54 (1999).

[14] The five nonexclusive *Daubert* factors are: (1) whether the expert's technique can be or has been tested; (2) whether the method has been subjected to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of

## III. Analysis

***Jon Hillis***.   Double Diamond designated Hillis to opine on the ability to replace damaged trees with mature trees.  Homeland moved to strike Hillis's testimony, arguing that it is not relevant and not reliable.  [Doc. No. 111].  Homeland also argues that Hillis's opinions regarding replacement costs are untimely.

The Court finds that Hillis's testimony is relevant.  Homeland contends that "at this point in the litigation, whether replacement trees are available, whether it is possible for [Double Diamond] to replace its trees, and whether those trees will survive, is wholly irrelevant to any issue remaining before the Court."[15]  This is so, Homeland argues, because the only issue remaining is the recovery for debris removal.

But as the Court explained above, to determine the recovery for debris removal, the parties must determine the property-damage loss.  And that requires determining the actual cash value of Double Diamond's damaged trees, which in turn requires determining the replacement cost.   Hillis's expert testimony contradicts the testimony of Homeland's proffered expert, Steigerwaldt.  Steigerwaldt concluded that "it would be physically and practically impossible to replant trees of the same size as those lost."[16]  Hillis disagreed.  He believed that "it certainly is possible to replant trees of the same size (and at least average size) of those damaged at the Property."[17]

---

standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community.  *Daubert*, 509 U.S. at 593–94.

[15] Doc. No. 112 at 10.

[16] Doc. No. 113 at 69.

[17] *Id*. at 9.

Given that the cost to replace the damaged trees with saplings (as Steigerwaldt recommends) would be less than the cost to replace them with mature trees (as Hillis recommends), Hillis's testimony could be relevant in determining the replacement cost, which will affect Double Diamond's debris-removal recovery.

That said, Double Diamond expressly states that Hillis "is not being proffered by Double Diamond to testify regarding the cost to replace the damaged trees."[18] Presumably, then, Double Diamond only intends to proffer Hillis's testimony to show that mature trees could be used to replace the damaged trees and that they would likely survive. While the relevance of this testimony may be marginal, it is still relevant because it may cast doubt on Steigerwaldt's testimony.

Homeland also argues that Hillis's testimony is unreliable for two reasons: (1) he provides "no supporting data or methodology regarding the cost to replace trees," and (2) he "fails to provide supporting data regarding where nearly 20,000 trees can be obtained or where they will be planted at The Retreat."[19] This argument is flawed. First, Double Diamond does not intend to offer Hillis's testimony on the cost to replace trees, so the first point is moot. Second, because the discussion about tree replacement is relevant only to the extent that it is informing debris-removal recovery, whether trees are available or where they would be planted is irrelevant. It is merely a hypothetical exercise.

---

[18] Doc. No. 135 at 9. Double Diamond fails to clarify exactly what, then, Hillis *is* being proffered to testify about.

[19] Doc. No. 112 at 14–16.

Because Hillis's testimony is being used merely to opine on the possibility of replacing damaged trees with mature trees, the reliability of that testimony depends on the methods used to determine the viability of mature-tree replacement.  In his expert report, Hillis explains that based on his "personal experience and more than 20 years supplying and installing trees up to 20 caliper inches" the "survivability rate [of mature trees] exceed[s] 95%."[20]  He then goes on to describe the methods of mature-tree replacement, including boxing and round-ball.

This testimony is not subjective belief or unsupported speculation.  It is based on established methods for mature-tree planting and decades of experience.  So, the Court finds Hillis's testimony sufficiently reliable to be admissible.  The Court therefore **DENIES** Homeland's motion to strike the testimony of Jon Hillis.[21]

***Jason Grogan***.   Double Diamond designated Grogan to offer opinions regarding the number of damaged trees at The Retreat and the prior statistical sampling performed by Bartlett Tree Experts (Bartlett).  Homeland argues that "Grogan's opinions are not relevant or reliable and should be excluded."[22]

The Court finds that Grogan's opinions are relevant.  Expert testimony is relevant if it assists the trier of fact in understanding the evidence or determining a fact in issue.[23]  Because determining the number of damaged trees is necessary to

---

[20] Doc. No. 113 at 69.

[21] Homeland also argued that Hillis's opinions were untimely.  But because Hillis's opinions are not being used to address replacement costs, the Court finds the untimeliness argument moot.

[22] Doc. No. 115 at 11.

[23] *Daubert*, 509 U.S. at 591.

determine the property-damage loss, which will inform the debris-removal recovery, Grogan's opinions regarding the number of damaged trees is relevant.

Homeland also argues that Grogan's opinions are not reliable because his samples "produced sample-error rates far exceeding industry standards" and because he "utilize[d] a flawed sample design in 2018 that can only be described as pseudoscience . . . ."[24]  Homeland reminds the Court that it is to "make certain that an expert, whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[25]  The Court finds that Grogan did just that.

Although Homeland argues that Grogan's sample produced error rates exceeding industry standards, it does not provide evidence of this purported industry standard, aside from the *ipse dixit* of its own expert.  Double Diamond explains that the standard error rate described by Homeland's expert is applicable when calculating wood *volume*.  But Grogan was not calculating *tons* of trees; he was calculating the *number* of trees.  The standard error rate when calculating wood volume is therefore inapplicable.  And even if it were applicable, it lacks any support, such as a treatise.

Homeland also claims that Grogan's methods—statistical forestry sampling— were akin to pseudoscience.  It argues this because: (1) Grogan took no photos;

---

[24] Doc. No. 115 at 12–13.

[25] *Kumho Tire Co.*, 526 U.S. at 152.

(2) Grogan failed to systematically identify sample locations before visiting The Retreat; (3) Grogan did not plant stakes; (4) Grogan did not record the size of species of damaged trees; and (5) Grogan could not differentiate between trees damaged before and after the storm.

As a threshold matter, the Court recognizes that statistical forestry sampling is not pseudoscience. It is a recognized forestry tool used by governments and private forestry management when physical inventory is impossible.[26]

The Court now considers each of Homeland's concerns.

**Photography.** While Grogan did not take photos, this doesn't convert his sample into pseudoscience. His method is statistical sampling; statistics do not require photography.

**Systematic Identification.** Homeland's allegation that Grogan didn't identify sample locations before visiting The Retreat is contradicted by Grogan's deposition:

> Q: What did you do to prepare for [the site visit in 2018]? You had no written procedures, but what did you have?
>
> A: I don't remember specifically what had been provided to me prior to the visit. . . . I had viewed [the property] on aerial photography and had done very preliminary mapping of the site . . . ."[27]

Grogan reviewed aerial photography and conducted preliminary mapping, though he acknowledged that he "went to the site with very little knowledge."[28]

---

[26] *See* HARRY V. WIANT, JR., ELEMENTARY TIMBER MEASUREMENT 5.

[27] Doc. No. 116 at 336–37 (85:11–86:7).

[28] *Id.* at 336 (85:22).

Importantly, upon arrival, Grogan "drove through the property and got a general idea of the topography. . . . [T]hen [he] went to various locations and established samples of one-tenth acre circular plot."[29]

***Failure to Plant Stakes.*** Because Grogan did not plant stakes, Homeland argues that it cannot reproduce his sample. But he did provide Homeland with GPS coordinates, which could have been used to recreate his sample, not "exactly" but "in a very similar manner."[30]

***Failure to Record Sizes/Species of Trees.*** Grogan did not record the size and species of trees because it was outside the scope of his report. Bartlett, who performed the initial sampling, had already recorded the size and species of trees. And Grogan was retained to evaluate Bartlett's prior statistical work, which did not require documenting the size and species of damaged trees, but rather determining the overall number of damaged trees.

***Inability to Distinguish.*** If true, Homeland's claim that Grogan could not distinguish between trees damaged before or after the storm would have the greatest impact on the reliability of his testimony. After all, determining the number of trees damaged in the 2015 storm event is essential to determining the debris-removal recovery. But Grogan explained in his deposition that he can determine when a tree was damaged:

> Q: What I am getting at is you have no way to determine whether a tree you looked at during your inventory was or was not damaged prior to the April event; correct?

---

[29] *Id.* at 317 (66:3–25).

[30] *Id.* at 321 (70:11–15).

A:    There are indicators that you can look for that give you a general idea of the age since damage.  If there is a significant amount of decay, just from experience, look at the bark, if it is sloughing off; if there is signs of wood rotters, that sort of thing, you that that damage has taken many years for that amount of decay to occur.[31]

In light of the five factors outlined in *Daubert*, the Court finds Grogan's testimony to be reliable.  Importantly, to the extent that Grogan's sample contains a range of the number of damaged trees, this goes to the *weight* of the evidence, not its *admissibility*.   The Court therefore **DENIES** Homeland's motion to strike the opinions of Grogan.

***Scott Cullen.***   Double Diamond designated Scott Cullen as an expert regarding the value of the damaged trees.  Homeland challenges both the relevance and reliability of Cullen's testimony.

Homeland argues that because Cullen's "opinions are limited to valuing [Double Diamond]'s damaged trees and do [not] include conclusions regarding debris removal costs," the testimony is not relevant.[32]  The Court disagrees.  For the reasons explained in the Court's analysis above, determining the value of the damaged trees is necessary to determine the property-damage loss, which informs the debris-removal recovery.   For that reason, the Court finds that Cullen's testimony is relevant.

Homeland also contends that Cullen's testimony is not reliable, in part because it relies on Grogan's sample.  Because the Court found Grogan's sample to be reliable,

---

[31] *Id.* at 351–52 (100:23–101:10).

[32] Doc. No. 118 at 11.

11

this argument is moot.  But Homeland's reliability argument doesn't end there; it also asserts that Cullen's opinions are unreliable because "his valuation methods should not be used to value undesirable trees in a forest setting, and he arbitrarily applies depreciation value to figures without any support."[33]

Testimony is reliable when "the reasoning or methodology underlying the testimony is scientifically valid."[34]  Such testimony must be "more than subjective belief or unsupported speculation."[35]  Here, Homeland argues that Cullen's use of the Trunk Formula Method is inappropriate because that method is typically limited to "residential and urban landscape settings."[36]  Because much of The Retreat was undeveloped forest land, this method is therefore not the accepted method to determine the value of (at least many of) the damaged trees.

Double Diamond urges that The Retreat is not a forest, but rather a private golf community.  While that may be true to an extent, it ignores the reality that a great portion of The Retreat was undeveloped land meeting the United States Forest Service's definition of forest land.  And, according to The Guide for Plant Appraisal, the Trunk Formula Method is an inappropriate method to value the cost of the trees in forest land.

---

[33] *Id.*

[34] *Knight*, 482 F.3d at 352 (citing *Daubert*, 509 U.S. at 592–93).

[35] *Daubert*, 509 U.S. at 590.

[36] GUIDE FOR PLANT APPRAISAL, COUNCIL OF TREE & LANDSCAPE APPRAISERS (Stephanie Ebersohl, et al. eds., 10th ed. 2019).

Because Cullen's conclusions were based on a method rejected by the scientific community for use in valuing trees in a forest setting, the Court finds Cullen's testimony unreliable.

The Court does not reach Homeland's depreciation arguments because it finds that the underlying methodology was unreliable, which would necessarily affect the results of the depreciation. The Court therefore **GRANTS** Homeland's motion to strike the testimony of Cullen.

***Edward Steigerwaldt.*** Double Diamond seeks to exclude the testimony of Steigerwaldt, Homeland's expert. Steigerwaldt offered opinions on two issues: (1) the value of the damaged trees, and (2) the cost and method of debris removal. Double Diamond claims that Steigerwaldt's testimony should be excluded because he used the improper method of calculating tree value in light of the Court's summary judgment order, making the value estimates not relevant, and he lacks the necessary qualifications to opine on debris-removal.

To determine the value of the damaged trees, Steigerwaldt looked to the property value. But the Court's most recent summary judgment order explained that the proper calculation of actual cash value is the cost of repair or replacement less depreciation. Property value is not a consideration. Steigerwaldt states that he did not use the Court's method:

> Q.   Okay. And in rendering your opinions in your reports or in this case, did you use a definition of actual cash value as replacement cost minus depreciation?

A.      No.[37]

And in his expert report, he noted: "[t]he appropriate methodology to determine [tree replacement cost value and tree actual cash value] can only be accomplished within the broader, overall property value context."[38]   Homeland contends that "Steigerwaldt's opinion is directly relevant to the cost to actually replace trees at The Retreat with a proven approach."[39]  But given that Steigerwaldt's opinions rely on an improper metric for determining actual cash value, they are not relevant.

Homeland also argues that Steigerwaldt's opinions are relevant to the extent of its defense to Double Diamond's claim that it violated Chapter 541 of the Texas Insurance Code.   Homeland relied on Steigerwaldt's report to make its claim determination.  That report is now needed, Homeland argues, for its Chapter 541 defense, even if the jury does not use it to inform its calculation of tree value.  The Court agrees with Homeland. Expert testimony is relevant if it assists the trier of fact in understanding the evidence or determining a fact in issue.[40]  Steigerwaldt's report is relevant to the extent that it will assist the jury in determining whether Homeland's defense is meritorious.

Double Diamond also challenges Steigerwaldt's opinions on the cost and method of debris removal.  It argues that he is not qualified to opine on debris removal because he lacks the higher degree of knowledge, skill, experience, training or

---

[37] Doc. No. 121, Exhibit 2 at 75:19–23.

[38] Doc. No. 121, Exhibit 1 at 5.

[39] Doc. No. 130 at 12.

[40] *Daubert*, 509 U.S. at 591.

education required of an expert.[41]   While Double Diamond acknowledges Steigerwaldt's qualifications with respect to forest appraisal, it alleges that he cannot "identify any prior testimony, experience, publication, presentation, or certification relating to tree debris removal."[42]  While Steigerwaldt's CV may lack specific debris-removal certifications, he has owned and managed a land-services company for roughly 40 years.  That company "manages roughly 350,000 acres of investment timberland."[43]  Over 40 years, Steigerwaldt has been involved in debris removal.[44] Qualifications may derive from knowledge and experience, which Steigerwaldt has amassed over his career.  Accordingly, the Court finds that he is qualified to offer opinions on debris removal.

Finally, Double Diamond argues that Steigerwaldt's opinions regarding debris removal are inadmissible because they are speculative and without factual basis.  It alleges this because Steigerwaldt's opinions "are simply the repeated, unsubstantiated, and untested opinions of an undesignated third party."[45] Steigerwaldt's export report on debris removal is limited to the following:

> To assess cleanup costs, high resolution aerial photography was provided to Monty Cain of Burleson Tree Service in Burleson, Texas. Burleson Tree Service provides tree care and tree damage cleanup throughout the state of Texas.  Mr. Cain inspected The Retreat in early October 2016 and provided his estimate of reasonable cleanup cost. Monty Cain was of the opinion that the total cleanup on the golf course's unsold lots and +/- 400 acres of potential development could be

---

[41] *See* FED. R. EVID. 702.

[42] Doc. No. 120 at 12.

[43] Doc. No 130 at 14.

[44] *Id.* at 16.

[45] Doc. No. 120 at 15.

accomplished for $1,500,000 to $2,000,000.  Based on our experience with pruning clearing and chipping, we believe a figure of $1,500,000 is appropriate.

Expert testimony is reliable when it is "more than subjective belief or unsupported speculation."[46]  The limited opinion on debris removal contained in Steigerwaldt's report is lacking any description of the methodology used to reach the conclusion.  For example, it lacks any mention of the tons of trees needing to be removed, the hours required to complete the project, the specialized tools needed, etc. Instead, it relies on Monty Cain's opinion for a bare conclusion of the costs of debris removal.  Homeland did not designate Monty Cain as an expert, and he dodged Double Diamond's attempts at service.  With no basis for the methods used to reach his conclusion, other than a reference to a third party's opinion, Steigerwaldt's opinion on debris removal is unreliable.

To the extent that Steigerwaldt's report is offered for Homeland's Chapter 541 defense, the Court finds that it is relevant and **DENIES** the motion to strike.  To the extent that it is offered to inform the actual cash value of the damaged trees, the Court finds that it is not relevant and **GRANTS** the motion to strike.  Steigerwaldt's opinions regarding debris removal are unreliable.  Accordingly, the Court **GRANTS** the motion to strike with respect to debris-removal opinions.

***Thomas Hittle.***  Hittle offers opinions on the number of damaged trees and the condition of the trees, including whether they were damaged by an event other

---

[46] *Daubert*, 509 U.S. at 590.

than the tornadic weather event in April 2015.  Double Diamond challenges the reliability of both these opinions.

Hittle used a sampling approach to determine the number of damaged trees. The parties dispute whether Hittle's approach was "remote sensing" or "aerial photo interpretation," but acknowledge that the two are interrelated.  Essentially, Hittle "viewed aerial photography of the damage on his computer screen and placed a point 'where each damaged tree was observed on the 2016 imagery.'"[47]

Double Diamond contends that Hittle's sampling approach is merely "a way of estimating a tree count, and must be validated, just as any other sampling or estimate."[48]  To have an accurate Count, Double Diamond argues, Hittle needed to verify the accuracy of his sampling by conducting a ground visitation.  Homeland, on the other hand, argues that Hittle's approach was accurate because he conducted an initial "trial limited tree mapping" using geographic-information-system application and because he "verified his opinions regarding the number of damaged trees by referencing the materials, information, and photographs gathered during his field inspections."[49]

Hittle admits that he did not return to the property after conducting his sampling approach:

> Q.   So then after you indicated points where you say it was one damaged tree, did you then go back to the property to verify that, in fact, it was only one tree, as opposed to self [several] trees?

---

[47] Doc. No. 141 at 2 (quoting Doc. No. 123, Exhibit 1 at 7).

[48] Doc. No. 122 at 7.

[49] Doc. No. 128 at 11.

A.      No.[50]

He declined to do so because it "would have been extensive and impractical."[51] To be reliable, an expert's opinion on scientific knowledge, like Hittle's, should include "proof that the principle supports what it purports to show, i.e. that it is valid."[52] Validity can be measured by (1) whether the theory can be tested, (2) whether it has been subjected to peer review or publication, (3) the known or potential rate of error, or (4) whether the technique has received general acceptance.[53]

Here, the theory can be tested. At least, it could have been tested at the time; whether the damaged trees still exist such that the sampling could be verified now is unclear. It has not been subjected to peer review or publication, but as an expert report, this factor is not relevant. The known or potential rate of error is unknown precisely because Hittle failed to verify his findings by conducting a ground visitation. The extent of the availability of information on error rate is Grogan's contradictory findings. The sampling technique has general acceptance; however, it is normally "coupled with ground visitation to check the accuracy of the interpretation."[54]

To decide whether Hittle's testimony is reliable, the Court must decide whether "the reasoning or methodology underlying the testimony is scientifically valid."[55] The Court finds that Hittle's sampling method is scientifically valid (neither

---

[50] Doc. No. 123, Exhibit 2 at 37:19–23.

[51] *Id.* at 38:4–5.

[52] *United States v. Posado*, 57 F.3d 428, 433 (5th Cir. 1995).

[53] *Id.*

[54] JAMES B. CAMPBELL, INTRODUCTION TO REMOTE SENSING 355, 380–81 (2d ed. 1996).

[55] *Knight*, 482 F.3d at 352 (citing *Daubert*, 509 U.S. at 592–93).

party argues that it is not), but his failure to conduct ground surveys to check the accuracy of the aerial-photo interpretation poses a problem for reliability. Testimony that is based on mere speculation is not reliable. And without conducting the recommended ground visitation to verify the results of his sample, Hittle's testimony regarding the number of damaged trees amounts to mere speculation. This is so even though Hittle visited the property beforehand to conduct a limited mapping. Visiting the property beforehand does not assist in verifying results that had not yet even been created; to do that, Hittle needed to visit the property *after*. He did not.

Accordingly, the Court finds that Hittle's testimony regarding the number of trees is unreliable.

Double Diamond also seeks to exclude Hittle's testimony regarding the condition of the damaged trees and whether they were damaged by other events. The thrust of Double Diamond's argument is that Hittle "supplied no factual basis as to the number of trees damaged by 'fires,' 'general dieback' and 'mortality from natural causes.'"[56] Homeland argues that "the basis of Mr. Hittle's opinions regarding tree damage as a result of other weather events are based on his field inspections and extensive experience in the industry."[57]

It is essential that "experts . . . give a factual predicate for their opinions in their reports."[58] The Court need not admit testimony "that is connected to existing

---

[56] Doc. No. 122 at 13.

[57] Doc. No. 128 at 20.

[58] *Space Maker Designs, Inc. v. Weldon F. Stump & Co., Inc.*, 2020 WL 21805274 at *3 (N.D. Tex. Mar. 13, 2003) (Sanders, J.).

data only by the *ipse dixit* of the expert."[59]  In determining whether testimony is reliable, the focus should be on the reasonableness of the expert's approach regarding the matter to which his testimony is relevant and not on the conclusions generated by the expert's methodology.[60]

> An excerpt regarding the condition of trees reads:

> Evidence of fire, as well as general dieback and mortality from natural causes such as drought conditions, left trees weakened or dead.  Local news articles include mention of fires in the area in early October 2011, and the broader Texas area experienced drought conditions from a period of mid 2010 into 2015.

The Court finds that Hittle's opinions on tree condition are reliable.  His opinions are not based merely on speculation; they are based on his extensive experience, aerial sampling, and field inspections.  The excerpted conclusion demonstrates that news articles regarding fires and drought conditions also confirmed Hittle's observations.  These are sufficient factual bases to ensure the reliability of Hittle's testimony.  Accordingly, the Court finds that Hittle's opinions regarding tree condition are reliable.

The Court therefore **GRANTS** Double Diamond's motion to strike with respect to Hittle's testimony on the number of trees and **DENIES** Double Diamond's motion to strike with respect to Hittle's testimony on the condition of trees.

---

[59] *Gen. Elec. Co.*, 522 U.S. at 146.

[60] *Daubert*, 509 U.S. at 595; *Kumho Tire*, 526 U.S. at 153–54.

**Bret Vicary.**   Homeland retained Vicary as a rebuttal witness to dispute Cullen's findings.  "Specifically, Mr. Vicary analyzed the methodology and conclusions of both Mr. Steigerwaldt and Mr. Cullen to 1) discuss industry standards regarding the reasonableness of multiple approaches to valuing damaged trees . . . and b) analyze Mr. Cullen's application of [trunk formula method] to the facts of this case."[61]   Double Diamond now moves to strike Vicary's opinions on (1) the value of trees; (2) the cost of debris removal; and (3) the number of trees damaged.

As a threshold matter, the Court addresses Double Diamond's assertion that all of Vicary's opinions are needlessly cumulative.  Double Diamond argues that Vicary's "opinions are nothing more than an adoption of the opinions of Homeland's other experts (Steigerwaldt and Hittle) and a criticism of Double Diamond's experts (Grogan and Cullen)."[62]   Homeland contends that Vicary's opinions are not needlessly cumulative because he was retained specifically to address the alleged flaws in Cullen's reasoning.   Unlike Homeland's other experts, Vicary specifically analyzes Cullen's methodology and "his report provides almost a page-by-page analysis and rebuttal of Mr. Cullen's depreciation method . . . ."[63]   In other words, while Steigerwaldt and Hittle may have interacted to a limited degree with Cullen's report, Vicary's entire purpose as an expert was to rebut it.

---

[61] Doc. No. 126 at 10.

[62] Doc. No. 124 at 16.

[63] Doc. No. 126 at 23.

Federal Rule of Evidence 403 states that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . needlessly presenting cumulative evidence."[64]   While the Court has discretion to exclude cumulative testimony, the Fifth Circuit has not "impose[d] a precise limit on the number of experts who can testify in a given area."[65]

The Court finds that the probative value of Vicary's opinions is not substantially outweighed by the danger of needlessly presenting cumulative evidence.   While other experts touch on issues discussed by Vicary, the primary purpose of Vicary's opinions is different.   There may be some overlap of opinion, but not to the extent that the Federal Rules contemplate.   And given that the Fifth Circuit has not set a limit on the number of experts, this Court finds no danger in allowing Vicary's testimony.

Double Diamond also argues that all of Vicary's opinions should be excluded as irrelevant because they are tied to the market value of the property.   In this Court's most recent summary judgment order, it held that the proper calculation of actual cash value was the cost of repair or replacement less depreciation.   The market value of The Retreat, therefore, does not play a role in determining the actual cash value of Double Diamond's losses.

---

[64] FED. R. EVID. 403.

[65] *Leefe v. Air Logistics, Inc.*, 876 F.2d 409, 411 (5th Cir. 1989).

Vicary's report did not use this formulation of actual cash value:

Q.    In this case, did you provide an independent analysis concerning actual cash value?

A.    No.

. . .

Q.    Do you understand the general theory of replacement costs minus depreciation equals actual cash value?

A.    I don't understand that.

Q.    Do you have a master's in Finance?

A.    I have a master's in Business Administration.

Q.    You have a master's in Business Administration, and it's your testimony to the ladies and gentlemen of the jury, that you do not understand the theory of replacement cost minus depreciations equals actual cash value?  Is that your testimony?

A.    That's my testimony.[66]

Vicary admitted in his deposition that (1) he did not conduct his analysis using this Court's mandated method of actual cash value; and (2) he does not understand actual cash value.  Vicary was retained as a rebuttal witness to analyze Cullen's conclusions.  But Vicary's critiques of Cullen's report are all couched in market value—which is not a relevant consideration in this case. While it may be true that in typical forestry settings, market value is an essential consideration, that consideration is not present in this litigation.  Put another way, the Court does not insinuate that Vicary's conclusions are

---

[66] Doc. No. 125, Exhibit 2 at 104:18–21, 89:3–17.

factually wrong, but they are not relevant to the resolution of the issues in this case because they spring from the idea that market value is an essential consideration.

Accordingly, the Court **GRANTS** Double Diamond's motion to strike the testimony of Bret Vicary because it is not relevant to determining the property-damage loss according to this Court's ruling on actual cash value.

### IV. Conclusion

For the foregoing reasons, the Court **DENIES** Homeland's motion to strike Jon Hillis, **DENIES** Homeland's motion to strike Jason Grogan, and **GRANTS** Homeland's motion to strike Scott Cullen.  The Court **GRANTS IN PART** and **DENIES IN PART** Double Diamond's motion to strike Edward Steigerwaldt, **GRANTS IN PART** and **DENIES IN PART** Double Diamond's motion to strike Thomas Hittle, and **GRANTS** Double Diamond's motion to strike Bret Vicary.

**IT IS SO ORDERED** this 23rd day of December 2020.

_____
BRANTLEY STARR
UNITED STATES DISTRICT JUDGE

24